In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 25-1299

MACE DAVIS,

*Plaintiff-Appellant,*

*v.*

CITY OF ELGIN, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-05108 — **Martha M. Pacold**, *Judge.*

_____

ARGUED MAY 21, 2026 — DECIDED JULY 9, 2026

_____

Before KIRSCH, PRYOR, and MALDONADO, *Circuit Judges.*

KIRSCH, *Circuit Judge*. Mace Davis threatened to shoot his ex-wife and her nephew. In a subsequent standoff with the police, he did not obey orders and threatened to commit suicide and harm the officers. To subdue Davis, officers shot him four times with non-lethal ammunition. Davis sued, alleging that the officers used excessive force against him. But because he cannot point to any clearly established law showing that the officers' behavior violated the Constitution, we affirm the

district court's grant of summary judgment for the defendants.

I

A woman called the police to report that Mace Davis threatened his ex-wife and roommate with a shotgun while under the influence of alcohol. Dispatch called the ex-wife, and she confirmed that after an argument, Davis went into his bedroom, reappeared with what seemed to be a rifle, laid it on the kitchen table, and remarked that he should shoot her and her nephew. Though the gun was covered with a blanket, the ex-wife saw enough to see that his finger was on the trigger. She then said, however, that Davis claimed he had been joking.

In response, the City of Elgin sent patrol officers, four different S.W.A.T. teams, an armored vehicle, a robot, negotiators, snipers, and high-ranking members of the police department to Davis's home. The police surrounded the house but were unaware that Davis had left, gone to his neighbor's, and fallen asleep.

A police negotiator eventually reached Davis by phone, but Davis hung up. On a later call, Davis threatened to harm himself with a knife, and the negotiator relayed over the radio to the other officers that Davis was threatening to slit his own throat. As a result, the officers worried that Davis was armed with knives. And based on the calls with Davis, the negotiator believed that Davis threatened to hurt the officers, that he would release dogs on them, and that he would use knives against them, though Davis denies that he threatened the officers over the phone.

At this point, Sergeant James Lalley authorized the use of non-lethal impact weapons to subdue Davis if and when he came outside so that he would not retreat into the house. Eventually, Davis came outside. A negotiator asked him to come down from the porch, but Davis refused. In accordance with Sergeant Lalley's plan, Sergeant Todd Pavoris fired at Davis with plastic ammunition; the expected outcome from such a shot is blunt force trauma or maybe broken bones. And indeed, the shot hit Davis's right forearm and snapped the bone in half. Davis went back into the house.

About ten minutes later, Davis reemerged. He stepped onto the front porch and attempted to demonstrate that he was unarmed. But he then shouted at the officers: "[s]o I want to know who's that [expletive] was who shot me because I want to [bust or punch] his … face in." In response, officers shot him two more times, hitting his thigh. Then, as Davis began to lower himself to the ground, an officer fired one more shot, which also hit him.

Davis eventually pled guilty to disorderly conduct. He then filed this lawsuit under 42 U.S.C. § 1983, alleging that the officers used excessive force against him in violation of the Fourth Amendment. The district court granted summary judgment for the defendants, and Davis appealed.

## II

We review a grant of summary judgment de novo, *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 983–84 (7th Cir. 2020), construing all facts and making all reasonable inferences in favor of Davis. See *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014).

Qualified immunity offers police officers a shield to civil liability when they do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). The shield is pierced when (1) officers violate the Constitution or a federal statutory right and (2) their conduct is clearly established as unlawful. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). As to the second step of that analysis, "[t]he relevant inquiry is whether existing precedent placed the conclusion that the officer acted unreasonably in these circumstances beyond debate," *Mullenix v. Luna*, 577 U.S. 7, 13–14 (2015) (per curiam) (citation modified), unless the conduct was "so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013).

Davis says that precedent clearly established that the officers' conduct was unreasonable in these circumstances because our case law shows that using such a high level of force against an unarmed subject who poses no immediate threat to the officers is unconstitutional. As a preliminary matter, Davis does not argue each shot as a separate occurrence. See *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) ("[T]he rule that points not argued will not be considered distinguishes our adversarial system of justice from an inquisitorial one.") (citation modified). At best, he splits the four shots into two groups: the first shot and the last three. It is true that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993). But, in any event, Davis waived any argument that the fourth shot, and only the

fourth shot, violated the Constitution. See *United States v. Waldrip*, 859 F.3d 446, 449 (7th Cir. 2017).

Regardless of whether we consider the four shots together or the first one and the last three separately, Davis cannot carry his burden to show that the officers violated a clearly established right to be free from a particular use of force. See *Abbott*, 705 F.3d at 725. The best case he offers is *Phillips v. Community Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012). In *Phillips*, police officers suspected Tamara Phillips of driving a stolen vehicle and driving under the influence of drugs or alcohol. *Id.* at 517. They commanded that she get out of her car, but she did not follow the order. *Id.* at 518. She was so intoxicated that the "officers knew they were dealing with an arrestee of diminished capacity." *Id.* at 524. Indeed, it was "clear that Phillips was never actively resisting arrest." *Id.* Nonetheless, from 40 to 50 feet away, an officer shot her with an impact weapon that had "force equivalent to a .44 magnum pistol." *Id.* at 518, 521. We granted her judgment as a matter of law, reversing the district court and finding that the officers used excessive force and were not entitled to qualified immunity. *Id.* at 517, 524.

Davis argues that the district court erred in distinguishing *Phillips*. But *Phillips* is nothing like this case. As to the first shot (or all four shots taken together), the analysis is simple. The officers had good reason not to want Davis to go back into the house, perhaps out of fear that he would go back to grab a weapon. See *Brooks v. City of Aurora*, 653 F.3d 478, 487 (7th Cir. 2011) ("An officer, faced with a suspect fleeing toward his home and ignoring police commands, is not obliged to give that suspect an opportunity to retreat into his home and, perhaps, to fortify himself or to escape before the officer employs

reasonable means of incapacitation."). That issue wasn't present in *Phillips*, where we said that "any threat [Phillips] presented had already been substantially contained." 678 F.3d at 525.

Even separating the last three shots from the first one, Davis's arguments fail. Davis says the district court inappropriately distinguished his level of incapacitation from Phillips's. Yet Davis's incapacitation differed both in degree and in kind. Phillips was "very drunk" and had "very little memory of the incident." *Id.* at 518, 520. And the officers testified "repeatedly" that they knew Phillips was drunk and initially suspected that she was "passing in and out of consciousness." *Id.* at 524. In short, she did not obey commands precisely because she was so incapacitated. Davis, on the other hand, was responsive to the officers, walking around, and even behaving in what he categorized as a verbally abusive manner. Davis also argues that his broken arm incapacitated him in the same way that Phillips was incapacitated. But he is mistaken: intoxication is entirely different from having a broken arm.

Davis also says the district court inappropriately distinguished the severity of his crime from that of Phillips's. Again, the district court did not err. The police in *Phillips* believed they were dealing with car theft, but after Phillips's vehicle didn't match the reported stolen vehicle, that belief quickly became objectively unreasonable. *Id.* at 522–23. So, at the time they shot Phillips, the officers were only dealing with a suspected drunk driver. Here, the officers were told that Davis had threatened his ex-wife with a rifle. That his ex-wife later said that Davis said he was joking doesn't mean that the officers should have felt they were looking to arrest a suspect for a crime like drunk driving. See *Graham v. Connor*, 490 U.S.

386, 396–97 (1989) (remarking that not all actions, even if they "later seem unnecessary in the peace of a judge's chambers, violate the Fourth Amendment") (citation modified). Since the excessive force analysis requires us to consider the reasonability of the officers' actions in "proportion to the threat posed," *Phillips*, 678 F.3d at 529, the distinction is enough to show that the officers' actions were not clearly established as unconstitutional.

Relatedly, unlike in our case, Phillips was no threat to the officers, to herself, or to anyone else. In that case, we highlighted that she "never exhibited any sort of aggressive behavior toward the officers before or after they located her car, nor did she make any attempt to escape." *Id.* at 524. Even if Davis didn't threaten the officers, he exhibited aggressive behavior toward them, and he even admitted that he was verbally abusive toward them. And regardless, the Supreme Court has explained that

> reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight and … the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.

*Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (citation modified). From the officers' perspective, Davis had made threats with a gun earlier in the day, had knives during the standoff, had threatened suicide, and had made threats to the officers. Taken together, *Phillips* did not clearly establish that the officers acted unconstitutionally.

The only other Supreme Court or in-circuit case Davis points us to is *Omdahl v. Lindholm*, 170 F.3d 730 (7th Cir. 1999). But he uses that case only to stand for the proposition that the use of impact weapons, in certain contexts, might be considered a "higher level of force along a ladder of escalating force." *Id.* at 733. He at no point explains why that case shows that the officers should have known beyond debate that their actions were unconstitutional.

To the extent that Davis argues that the force used by the officers was so plainly excessive that they would have been on notice that they were violating the Fourth Amendment, that contention also fails. For his argument to succeed, Davis "must show that a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question." *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021) (citation modified). Davis identified no constitutional rule with any specificity at all. In this case, holding the officers accountable without any clearly established case law would risk punishing the officers for violating "extremely abstract rights." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017). Therefore, the officers are qualifiedly immune.

Davis also sued the City of Elgin. But in his brief, he only argues that the officers acted unconstitutionally. Nowhere does he suggest a theory of liability that could reach the City of Elgin.

AFFIRMED